Filed 7/2/25  P. v. Zwerenz CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C100510 |
| Plaintiff and Respondent, | (Super. Ct. No. PC20060359) |
| v. | |
| TRACY LEE ZWERENZ, | |
| Defendant and Appellant. | |

On February 15, 2024, the trial court granted the district attorney's petition to extend the commitment of defendant Tracy Lee Zwerenz to the Department of State Hospitals as an offender with a mental health disorder (OMHD) to January 3, 2025. (Pen. Code, § 2970 et seq.)  (Statutory section citations that follow are to the Penal Code.)  The trial court found that defendant has a severe mental health disorder, that his mental health disorder is not in remission or cannot be kept in remission without treatment, and that by reason of his severe mental health disorder, he represents a substantial danger of physical harm to others.  The court also determined that defendant

1

was not an appropriate candidate for outpatient placement, as he would likely not participate in treatment.

Defendant contends on appeal that substantial evidence does not support the trial court's determinations. He also claims his trial counsel rendered ineffective assistance.

We affirm the trial court's order.

## FACTS AND HISTORY OF THE PROCEEDINGS

## I

### *Legal Background*

The Mentally Disordered Offenders Act (§ 2960 et seq.) "provides for involuntary civil commitment as a condition of parole for prisoners who are found to have 'a severe mental disorder' if certain conditions are met. (§ 2962, subds. (a)-(f).) The commitment is for a term of one year and may be extended annually for an additional year on petition of the district attorney. (§ 2972, subds. (a), (b), [(e)].)" (*People v. Dunley* (2016) 247 Cal.App.4th 1438, 1442, fn. omitted.)

If the trial court finds "[1] that the patient has a severe mental health disorder, [2] that the patient's severe mental health disorder is not in remission or cannot be kept in remission without treatment, and [3] by reason of the patient's severe mental health disorder, the patient represents a substantial danger of physical harm to others, the court shall order the patient recommitted." (§ 2972, subd. (c).)

However, if the committing court finds there is reasonable cause to believe the committed person can be safely and effectively treated on an outpatient basis, the court shall release the person on outpatient status. (§ 2972, subd. (d).)

For purposes of this statute, the term " 'severe mental health disorder' " means "an illness, disease, or condition that substantially impairs the person's thought, perception of reality, emotional process, or judgment; or that grossly impairs behavior; or that

2

demonstrates evidence of an acute brain syndrome for which prompt remission, in the absence of treatment, is unlikely." (§ 2962, subd. (a)(2).)

The term " 'remission' " means "a finding that the overt signs and symptoms of the severe mental health disorder are controlled either by psychotropic medication or psychosocial support. A person 'cannot be kept in remission without treatment' if during the year prior to the question being before . . . a trial court, the person . . . [among other possible actions] has not voluntarily followed the treatment plan. In determining if a person has voluntarily followed the treatment plan, the standard is whether the person has acted as a reasonable person would in following the treatment plan." (§ 2962, subd. (a)(3).)

## II

### *Evidence at Trial*

#### A.    Prosecution's Evidence

In 1997, defendant was convicted of sexual battery. (§ 243.4, subd. (a).) He molested two 17-year-old female victims. Defendant received treatment at Atascadero State Hospital from 1998 to 2001 pursuant to the Mentally Disordered Offenders Act. After being in the community under the Department of State Hospital's conditional release program (CONREP), defendant was returned to a state hospital due to not following the terms and conditions of his release. He was treated at Napa State Hospital from 2003 to 2013. He was transferred to Coalinga State Hospital in 2013, where he remains involuntarily committed.

Defendant has a diagnosis of two mental health disorders. He has a diagnosis of pedophilic disorder -- nonexclusive type, sexually attracted to females. He also has a diagnosis of major depressive disorder, recurrent and episodic.

3

### 1. Defendant's Treatment Plan

Defendant's Department of State Hospitals treatment plan documents defendant's risk factors and specifies areas of focus requiring defendant's improvement in order for him to be discharged. The plan also establishes criteria to determine whether it is appropriate to discharge defendant. The plan utilized by the prosecution at trial is dated August 3, 2023.

According to the plan, defendant is considered to be at low risk of suicide or self-harm. He was hospitalized in 1993 due to suicidal ideation, and he reported he stuck his finger in a light bulb socket in 1997 while in prison. There were no reports of suicidal ideation or gestures during the most recent reporting period. Although he has several chronic and acute suicidal risk factors, they are mitigated to a low risk by his ongoing treatment.

Defendant is considered to be at low risk of committing violent or aggressive behavior against others. He has a record of confrontation and acts of aggression while at Coalinga. In May 2018, defendant and a patient were involved in a verbal and physical altercation. In November 2018, defendant was placed in seclusion after lunging at the shift lead when he was told he "was being placed on 1:1 for danger to self." In November 2019, defendant and a patient had a verbal altercation in the quiet room after the patient had pushed defendant. In November 2019, defendant had a verbal altercation in the patient showers. In October 2020, defendant became angry when he was told his ibuprofen had been discontinued due to drug interactions with his other medications. He punched a plexiglass window with his fist. In November 2020, defendant was involved in one incident of aggression toward staff. In February 2021, defendant was accused of touching a peer inappropriately.

The most recent incident of aggression occurred in October 2022, when a peer asked defendant for some food. Defendant refused, and the peer hit him with his walker.

Defendant picked up the peer's walker and chased the peer around the room while holding the walker above the peer's head. Both patients were redirected without further incident.

Despite this record, defendant's risk for violent behavior toward others is considered to be low. A variety of management measures are in place to help mitigate his risks. In addition to being housed in a 24-hour secure setting, defendant has a psychiatrist who will meet with him regularly to review medications and other staff members who help him address barriers to compliance and his potential release. Defendant's integration into the unit milieu has allowed him to establish some supportive peer relationships and interact well with his treatment team. With adherence to his medication regimen and his potential enrollment in psycho-educational groups, defendant's risk of violence should remain low.

Defendant is compliant with voluntarily taking his psychotropic medications. The medication is controlling his symptoms.

The treatment plan states defendant may benefit from participating in groups that educate him regarding his mental illness, his history of trauma, his medication regimen, and taking responsibility for managing his mental illness. Recommended groups include medication education, managing mental illness, managing trauma, and a coping-skills building group. Defendant's primary coping skills include taking a walk to reduce agitation, speaking to a staff member to express frustration and resolve problems, and engaging in deep breathing exercises to remove tension and reduce agitation. But defendant has not participated in any psycho-educational groups or other activities that would assist him in meeting his discharge barriers.

Defendant spends most of his time in his room. Developing social skills is not an active focus for defendant, as he has participated in various social skills-related treatment groups in the past and has demonstrated improved social skills to his treatment team. But the treatment team has encouraged defendant to participate and practice social skills in

group supplemental activities. Defendant has declined to participate in supplemental activities.

As to defendant's dangerousness and impulsivity, the treatment plan recommends that defendant participate in groups to help him learn ways to manage his sexual interests in a healthy and appropriate manner, as well as better manage strong emotions. Recommended groups include emotion regulation, anger management, and sex offender treatment. Defendant has not participated in any of these groups while at Coalinga.

The treatment plan recommends that defendant complete a written and individualized seven-step wellness and recovery action plan (WRAP) in order to maintain his recovery and psychiatric stability for possible discharge and integration into the community. As of August 2023, defendant continues to decline to enroll in a WRAP group. Staff will continue to encourage defendant to complete this barrier to discharge.

The treatment plan states that defendant's most recent CONREP report, by Dr. Elizabeth Gates, dated June 2023 and discussed in greater detail below, indicated defendant was not suitable "for Community Outpatient Treatment (COT) at this time." The treatment plan sets forth the barriers to his discharge and the actions defendant must take to overcome those barriers.

Of relevance here, the treatment plan requires defendant, in order to demonstrate that he is managing his severe mental disorder to the level needed for community placement, to adhere to his medication regime and to develop three coping responses to manage his major depression disorder. The plan states that defendant has met these criteria.

The treatment plan requires defendant to demonstrate he has the skills not to be a danger to others while in the community. He is to accomplish this by completing a 12-month period of safe behavior without harm to others by not having incidents of assaultive behavior toward peers or staff. He is also to develop three coping responses to manage possible triggers of taking actions to harm others that could occur in the

6

community setting. The plan states that defendant has met these criteria. Defendant will use the following three coping responses to respond to triggers: (1) walk away and take a taxi out of the area; (2) call and talk with his sponsor; and (3) talk with a family member or friend.

To demonstrate he is not a danger, defendant is required to have no incidents of sexually inappropriate behavior for 12 consecutive months. He is also required to participate in sex offender treatment, where he will develop a realistic relapse prevention plan and sexual offender behavior changes to help him prevent future acts of dangerous sexual behavior and other behaviors that led to him committing his crime.

The treatment plan states that defendant has only partially met this criterion. He has not had an incident of inappropriate sexual conduct for more than 12 consecutive months. The plan referenced an incident on March 18, 2021, of "unwanted sexual conduct between patients," but the incident had occurred over 12 months prior. However, defendant has not enrolled in sex offender treatment at Coalinga. The plan noted that defendant had stated he had completed sex offender treatment when he was at another hospital, and that he and the court have documentation to show this. His social worker reviewed a document entitled "Request for PC 2972 Renewal" dated 2006, which mentions defendant completed sex offender treatment while he was hospitalized at Atascadero State Hospital.

The treatment plan requires defendant to demonstrate he has a comprehensive discharge plan to manage his transitional barriers for returning to the community. He is to do this by completing the WRAP that will address the transitional barriers of not having a full awareness of his mental illness and how it impacts his behavior and isolation. The plan states at one point that defendant has participated in this group, but it states at another point that defendant has not completed a written WRAP or participated in a WRAP group.

7

## 2. Dr. Elizabeth Gates

Dr. Elizabeth Gates is a consulting psychologist at Coalinga State Hospital. She assessed defendant to determine whether he should be released. Initially, defendant refused to speak with her. He stated it would do no good to interview him, that he did not like interviews or the people who conducted them, and he did not like her in her interviews with him.

Relying on medical records and reports, Dr. Gates prepared and submitted her report dated June 26, 2023, without having interviewed defendant. In her opinion, defendant's diagnosis of pedophilic disorder and major depressive disorder constitutes a severe mental illness as that term is defined in section 2962. As for the pedophilic disorder, defendant has a history of engaging in sexually deviant behaviors with nonconsenting prepubescent and pubescent children. He also has reported chronic intrusive thoughts regarding sex. Overall, he "has a significant history of experiencing 'intense and persistent sexual interest other than sexual interest in . . . mature, consenting human partners.' " His disorder "causes distress or impairment to him (multiple convictions) and harm to others."

Dr. Gates reported that as for the depression disorder, defendant has experienced sadness, depressive feelings, suicidal ideation, low self-esteem, agitation, and disruption of appetite and weight. He has suspicion or feelings of persecution and distrust regarding CONREP, the court, and evaluators. His traumatic family history and his history of being a victim of sexual abuse are likely precipitating factors for depression and subsequent pedophilic behaviors. He has been substantially impaired in his thinking, perception of reality, emotions, and behavior as defined under section 2962.

Defendant has received treatment for his pedophilic behaviors in the past through commitment to various state hospitals, as described above. In addition, in 1994, three years before the underlying conviction, defendant was convicted of sexually molesting

8

his prepubescent daughter, and for that he participated in sex offender treatment on an outpatient basis. As for attending sex offender treatment while committed, according to records from Napa State Hospital in 2013, defendant declined such treatment in a group setting; however, he stated he would accept individual therapy. At Coalinga, defendant has not participated in sex offender treatment, which would help him know his level of insight and his awareness of symptoms and behavior related to his pedophilic disorder.

In Dr. Gates's opinion, the overt signs and symptoms of defendant's severe mental disorder are not controlled by medication and/or psychosocial support. When defendant declined the interview with Dr. Gates, he "derailed" and sounded delusional. His voice was elevated, and he became increasingly irritable, sarcastic, and almost hostile. He often presents as depressed and anxious. His speech is circumstantial and hyperverbal, with disorganized tangential thoughts. He continues to experience signs and symptoms of depression and decompensation with disorganized tangential thoughts.

Defendant also continues to suffer from pedophilic disorder. Pedophilic disorder is a chronic condition. It is managed with psychosocial support and cognitive behavioral therapy. The passage of time and the absence of sexually offensive behavior at Coalinga State Hospital does not indicate he is not having this severe mental disorder or that he is no longer suffering from symptoms. It indicates only that he has not had the opportunity to act on the disorder, given he resides in a maximum-secured facility without access to children. His disorder is not in remission.

Defendant takes psychiatric medication for symptoms and "as needed" medication (PRN) for agitation or anxiety.[1] Defendant overuses his PRN's. He has declined

---

[1] PRN stands for pro re nata. It refers to additional medication the psychiatrist has authorized which the patient can request, such as medication for increased anxiety or agitation. It can also be offered by nursing staff on the unit when they interact with the patient if they feel it is necessary.

treatment for sex offending, substance recovery, and release readiness. He also declined group treatment for managing mental illness and anger. Contrary to his treatment plan, he has not participated in core groups. He has not been violent, but he has been aggressive.

Dr. Gates opined that as a result of his severe mental disorder, defendant represents a substantial danger of physical harm to others. His pedophilic disorder is a chronic condition that is not in remission. It will likely require ongoing psychosocial support and supervision for the remainder of his life in order to prevent him from reoffending. Without treatment, Dr. Gates believed it is likely that defendant's pedophilic disorder would result in further sexual offenses if he was in an environment of opportunity.

Defendant has a history of experiencing chronic intrusive sexual thoughts that have been significant factors in his sexual offending. Because he has not completed sex offender treatment, he has not acquired the skills necessary to control his deviant behavior if released. Dr. Gates thus believed defendant continues to be at risk for engaging in sexually violent behavior and represents a substantial danger of physical harm to others due to his severe mental disorder.

Dr. Gates stated that defendant generally demonstrates respect for his peers and staff, and he follows unit rules without infractions. Despite the use of medication and the availability of group treatment, defendant continues to have few, but episodic behavioral incidents, such as the 2022 incident involving the peer with a walker. These incidents occurred in a supervised setting. It was unknown how defendant would manage in the community. In Dr. Gates's opinion, it is the supervised controlled setting that keeps defendant as stable as he is.

Defendant reported he participated in sex offender treatment while at Atascadero State Hospital, which would have occurred between 1998 and 2001. He told others he completed that training and does not want to complete any more groups. Dr. Gates stated

that nonetheless, defendant's treatment team recommended he " 'develop a realistic relapse prevention plan and sexual offender behavior [change]" to prevent future dangerous sexual behavior and other behaviors that led to him committing his crime. In Dr. Gates's opinion, until defendant "can learn to manage his mental illness, impulses, and behavior, he cannot be safely managed in the community with a supervised or unsupervised release. Therefore, he remains a substantial danger to others due to his severe mental disorder."

At trial, Dr. Gates testified that after she submitted her June 26, 2023, report, defendant agreed to meet with her. That meeting occurred on November 4, 2023, by video conferencing. From that interview, Dr. Gates gleaned that defendant at first glance has a high opinion of himself, tends to blame others, and is dismissive and distrustful of others. He feels downtrodden and more of a victim, which lends to both his mistrust of others and inability to interact with others on the unit or in a group, and to his depression.

The November interview did not change Dr. Gates's opinions and conclusions set forth in her June 26, 2023, report. Dr. Gates testified concerning the conclusions reached in her report. Of relevance here, Dr. Gates testified that defendant is not following his treatment plan and is not fully receptive to it.

Dr. Gates repeated that in her opinion, defendant represents a substantial danger of physical harm to others due to his severe mental disorder. She explained, "[He] does not engage in treatment. Again, he isolates. And tends to demean others or see them in a denigrating light. And what that tells me is that that's his view of the world. So then he mistrusts others. He's pretty isolating. And then in the community, if he were to interact with others, it would be very easy to take advantage of others when feeling lonely, angry, irritable, depressed, or having sexual urges or obsessions to gratify himself. And he has made those statements to individuals, evaluators -- over time he explains that that's what he was doing when he was engaging in those acts. It was for sexual gratification."

11

In Dr. Gates's opinion, a complete sex offender treatment program is necessary for defendant prior to his release. It is necessary for learning coping mechanisms and how to deal with his urges while in the community. Dr. Gates believed a complete course was warranted even though defendant had previously completed part of a sex offender treatment course. Given his tendency to isolate and limit interaction with others, defendant was likely to reoffend in the community "where he could potentially force himself on someone [who is] more vulnerable, someone with a mental disorder, someone with a low intellectual cognitive functioning, and certainly with minors."

Asked under cross-examination whether pedophilia could go into remission, Dr. Gates stated, "We don't -- we have never labeled it as in remission. It could be described as stable." Dr. Gates agreed that defendant had not shown any symptoms or signs of pedophilic disorder in quite some time and that he was stable. There was no evidence that defendant had been acting out.

Dr. Gates remembered reviewing a Static-99 evaluation that was performed on defendant. She remembered defendant's score could have been 5.[2]

Dr. Gates in general agreed with defense counsel that as a 64-year-old, defendant would not have the same sex drive and desire as someone who was much younger. However, some recent research suggested that sex drive stayed the same for the elderly. But Dr. Gates said one would think it would continue to decrease. Asked whether, assuming the recidivism rate for someone diagnosed with pedophilia decreased every

---

[2]     In defendant's 2023 trial, Dr. Robert Wagner, a consulting psychologist at Coalinga State Hospital, testified for the state. Dr. Wagner testified that in February 2023, he performed the Static-99R on defendant to predict his future risk of reoffending. Defendant's score was zero. The lowest possible score is -4 (minus or negative 4). With a score of zero, defendant was considered to have a 2.5 to 3.0 percent chance of reoffending.

year, defendant would become less dangerous, Dr. Gates stated she believed "it would stay stable at that perhaps lower level."

Dr. Gates acknowledged that defendant was medication compliant and that he had been in treatment for almost 10 years when he was at Napa. Defendant had participated in individual sex offender therapy rather than group treatment. But persons with pedophilia needed ongoing reminders and treatment in the future to keep them stable and from not reoffending. That Dr. Gates had said defendant was stable did not suggest he did not have internal thoughts, strife, or desires. She did not know whether he did because he had not shared that he was plagued by them. It could be that defendant was using the treatment he had received to control and cope with his thoughts and desires, but defendant and Dr. Gates had not discussed any individual matters like those.

### 3. Dr. Anthony Rodriguez

Dr. Anthony Rodriguez is a psychologist with the Department of State Hospitals. He has interacted with defendant on a quarterly basis since February 1, 2023. Each time, he and the other members of defendant's treatment team met with defendant, reviewed his progress, and made recommendations. The treatment team had recommended defendant attend four different groups. Dr. Rodriguez's work focused on three of those: psychiatric education, violence risk, and substance abuse. However, defendant has not been attending any of the recommended groups. Dr. Rodriguez was not aware if defendant had attended any groups in the past.

Based on his interactions with defendant in a controlled environment within the institution, Dr. Rodriguez opined defendant had a low risk level for violence. Dr. Rodriguez explained that although defendant did not have a substance abuse diagnosis, he encouraged defendant to attend the substance abuse group just for knowledge and to maintain certain behaviors, but he would not make a recommendation for him to attend a substance abuse group. In Dr. Rodriguez's recollection, defendant had

13

not ever discussed in their treatment meetings a plan for when he is released into the community. But that was the social worker's focus, not Dr. Rodriguez's.

### B. Defendant's Evidence

Mary Bolin is a licensed clinical social worker employed at Coalinga State Hospital. She is a member of defendant's treatment team, and he is one of her patients. She updates his treatment plan as needed.

The treatment plan sets forth barriers to discharge which the patient must overcome. Defendant's barriers to discharge include his pedophilic disorders, anger issues, realizing what his mental health issues are, understanding his diagnosis, and working on not being a danger to the community.

Defendant has been open with Bolin about his struggles. Bolin testified, "[H]e once described himself, in the past, as being a monster. And not liking that person. And he overcame that, and he's no longer that person. And he's realizing how terrible his crimes were. He's wanting to be different, and he wants to be a good member of society. And that he's different. He doesn't feel he's a monster anymore. He's a good person."

Bolin stated that defendant had met many of the barriers set out in his treatment plan. Reviewing defendant's treatment plan dated February 6, 2024, Bolin stated that defendant had met the following barriers to discharge: adhering to medication, managing his severe mental disorder and developing coping skills, healing "the broken spirit" such as overcoming trauma in his life, substance abuse, understanding and overcoming dangerousness by demonstrating a safe period of behavior without harm to others, and developing coping responses to manage possible triggers.

Bolin found one barrier that was only partially met: "[T]hrough sex offender treatment, [defendant] will develop a realistic relapse prevention plan, and sexual behavior change, to prevent future acts of dangerous sexual behaviors, and other specific

14

behaviors, that led him to committing the crime in the past." Bowen stated, "[W]e want him to develop that behavioral change."

Defendant told Bolin that he participated in a number of groups at Atascadero State Hospital, including completing a sex offender treatment program there. Defendant showed Bolin a court document that referred to his completing that training. Bolin did not think defendant was currently attending any groups except possibly one for anger management. Defendant had explained he was not attending groups because he had completed a number of groups at Atascadero. Bolin stated that even if defendant completed the treatment at Atascadero, the hospital encouraged people to keep working on themselves and continue going to treatment groups. But defendant has not completed that treatment at Coalinga.

Bolin stated that defendant has a relapse prevention plan. That plan consists of developing strategies to handle triggers in the community. It includes a discharge plan. Defendant's discharge plan is to go back to his home and live in a trailer in the backyard of his father's property so he can be there and help his father and his elderly mother. It also includes strategies and knowing triggers and knowing resources in the community. Bolin believed defendant's discharge plan was "a good one" because defendant had positive support from his family.

Bolin had seen improvements in defendant's coping skills and overall behavior. Defendant has had little depression and is more in control of his emotional problems. He does not get triggered as often as he used to, and he is happier. He is taking his medication.

Bolin believed that defendant could be successful in the community and was not a danger. She testified, "He's voiced the desire to be a good person. He doesn't like the person he used to be. He's completely opposed to being that kind of person. He doesn't like that person. He's a new person. And he wants to be a good person. [¶] . . . [¶] I don't think he's a danger to the community."

15

On cross-examination, Bolin agreed that defendant does not attend most groups that are recommended to him. Bolin also agreed that for some time defendant has been refusing to complete the sex offender treatment program, even though his treatment team had recommended it. Asked if it was possible that someone who had completed a sex offender treatment program in the past might still need to repeat that course to gain more information or insight, Bolin stated, "Yes, a refresher course doesn't hurt anybody."

### III

*Judgment*

The trial court granted the district attorney's petition to recommit defendant. The court addressed each element of section 2972, subdivision (c). It found the first element was not in dispute. Defendant has a severe mental health disorder in the form of pedophilia and major depressive disorder.

As for the second element, whether defendant is not in remission or cannot be kept in remission without treatment, the trial court found beyond a reasonable doubt that defendant cannot be kept in remission without treatment. The evidence established that defendant has not followed his treatment plan, nor has he acted as a reasonable person would in following the treatment plan. This has been an issue of continuing concern. Dr. Gates testified to the importance of defendant participating in the sex offender treatment groups as a refresher to manage his illness, even assuming defendant had already completed the program at Atascadero State Hospital. The court found that the treatment plan is reasonable under the circumstances, and a reasonable person would follow this plan, particularly if he was seeking to show he had insight into his mental illness and could safely be released into the community.

As for the third element, risk of harm to others, the trial court found beyond a reasonable doubt that defendant posed a substantial danger of physical harm to others. Pedophilia is a chronic condition that requires support through group and individual

therapy. Defendant is resisting to engage in sex offender treatment and has refused to participate in the group sex offender treatment program since he was first placed at Coalinga State Hospital. There is no completion certificate or other documentation to indicate his progress in the individual sex offender treatment therapy he received at Atascadero. Even if there was, that would not change the outcome. Dr. Gates testified that defendant needed continuing therapy as a refresher and to develop insight and interest into his mental illness.

Dr. Gates testified to defendant's other traits that could affect him if he were released. These included the overuse of PRN's, his tendency to shift blame to others, irritability and anger, denigration of others, and hostility. All of defendant's basic needs are met at Coalinga, and being outside of the hospital's controlled structure and having to provide for himself would add to the other symptoms with which defendant must cope. It is easier for defendant to impact others when he is impacted by his irritability and anger. Defendant also would be unlikely to engage in services in an outpatient program, as he continues to refuse to fully follow his treatment plan. The court found that this reflected a lack of insight into his chronic mental illness.

The trial court acknowledged that defendant had engaged in no sexually deviant behavior during the past year. The last incident documented in the report occurred in 2021 when defendant allegedly touched another peer inappropriately. But the absence of evidence of sexual deviance in a controlled supervised environment did not establish that the prosecution had not met its burden of showing beyond a reasonable doubt that defendant posed a substantial danger of physical harm to others. As Dr. Gates had testified, the absence of incidents of sexual deviance does not establish that defendant does not have sexually deviant thoughts. Due to the chronic nature of pedophilia, the trial court found that defendant's relapse prevention plan and his support system were insufficient under the circumstances.

17

The trial court also acknowledged defendant's low score on the Static-99. The Static-99 is designed to predict recidivism. Even if, as Dr. Gates testified, sex drive and rates for recidivism with sex offenders possibly decreased with age, the relevant issue was not whether the sex drive or recidivism is less than at the time of the original commitment, but rather, whether the sex drive and rate of recidivism were at a level that the patient no longer presented a risk to others. On that point, the court found that the evidence of the Static-99 did not alter its overall analysis. It concluded, "Thus, given [defendant's] unwillingness to participate in the sexual offender treatment groups -- and otherwise comply with his treatment plan -- his lack of emotional regulation as reflected by his irritability and anger, and regular use of PRN's, and lack of insight into his pedophilia, compounded by his tendency to shift blame to others, and the chronic nature of his pedophilia, the Court finds, beyond a reasonable doubt, that [defendant] poses substantial danger and physical harm to others."

The trial court also denied defendant's request for outpatient treatment under section 2972, subdivision (d). The court found there was not reasonable cause to believe defendant could be safely and effectively treated on an outpatient basis. Defendant was unlikely to access services on an outpatient basis. The court acknowledged Bolin's different position, but it found Dr. Gates's testimony to be more compelling and consistent with the facts of the case.

DISCUSSION

I

*Substantial Evidence in Support of Recommitment*

Defendant argues that substantial evidence does not support the trial court's finding that he represents a substantial danger of physical harm to others because of his mental disorder. He concedes that substantial evidence supports the trial court's findings that he suffers from a serious mental disorder and the disorder cannot be kept in

18

remission without treatment. But he asserts the trial court treated his pedophilia as making him currently dangerous despite the lack of evidence of dangerousness and effectively shifted the burden of proof onto him to prove he was not dangerous.

"When reviewing a challenge to a civil commitment based on insufficient evidence, we consider the entire record in the light most favorable to the judgment to determine whether a reasonable trier of fact could have found beyond a reasonable doubt that the defendant met the requirements for the commitment. (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1503.) While inferences may constitute substantial evidence in support of a judgment, they must be the probable outcome of logic applied to direct evidence; mere speculative possibilities or conjecture are infirm. (*People v. Herrera* (2006) 136 Cal.App.4th 1191, 1205.) . . . '[I]n determining whether the record is sufficient . . . the appellate court can give credit only to "substantial" evidence, i.e., evidence that reasonably inspires confidence and is "of solid value." ' " (*People v. Jenkins* (2023) 95 Cal.App.5th 142, 151-152.)

Section 2962 does not define a substantial danger of physical harm except by specifying that this element "does not require proof of a recent overt act." (§ 2962, subd. (g).) The California Supreme Court has instructed that, while " 'substantial danger of physical harm to others' is without definition," "[i]n context, it appears to mean a prediction of future dangerousness by mental health professionals." (*In re Qawi* (2004) 32 Cal.4th 1, 24.) " 'A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment' " (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165), so long as it is not based on a " ' "guess, surmise or conjecture, rather than relevant, probative facts" ' " (*In re Anthony C.*, *supra*, 138 Cal.App.4th at p. 1504).

Substantial evidence supports the trial court's determination that defendant represents a substantial danger of physical harm to others due to his mental disorder. Dr. Gates opined that as a result of a severe mental disorder, defendant represents a

19

substantial danger of physical harm to others. His pedophilic disorder is a chronic condition that is not in remission. It will likely require ongoing psychosocial support and supervision for the remainder of his life in order to prevent him from re-offending. To that end, his treatment plan required him to participate in certain training and demonstrate understanding of his mental illness in order to be discharged. Yet, defendant has refused to participate in the required treatment for the entire time he has been at Coalinga since 2013.

He has not participated in sex offender treatment. As a result, he has not acquired the skills necessary to control his sexually deviant behavior if he is released. In that treatment, defendant would have developed a realistic relapse prevention plan and behavior changes to prevent future dangerous sexual behavior and other behaviors that led to him committing his crime.

Defendant has also not completed a written WRAP. This comprehensive discharge plan would assist defendant in maintaining his recovery and psychiatric stability for possible discharge and integration into the community. It would also help him address any transitional barriers he may encounter by his not having a full awareness of his mental illness and how it impacts his behavior and isolation.

Defendant's refusal to engage in these trainings in part led Dr. Gates to opine that defendant continues to be at risk for engaging in sexually violent behavior and represents a substantial danger of physical harm to others due to his severe mental disorder. Her expert opinion is not based on guess, surmise, or conjecture. It is based on the relevant, probative facts that defendant, contrary to the requirements of his treatment plan, has refused ongoing training, support, and supervision necessitated by the chronic nature of his mental illness so that he may be released without risk of engaging in criminal sexual behavior.

Dr. Gates also relied on defendant's behavior in the unit and his behavior toward her and others to reach her conclusion. Defendant tended to isolate himself from others.

He is dismissive and distrustful of others, seeing them in a denigrating light. In Dr. Gates's opinion, defendant's mistrust of others could lead him to take advantage of others when he is in the community and feeling lonely, angry, depressed, or having sexual urges or obsessions to gratify himself. Dr. Gates's expert opinion based on defendant's refusal to participate in sex offender treatment and complete a written WRAP and his distrust of others as shown by defendant's behavior is sufficient evidence to support the trial court's determination that defendant represents a substantial danger of physical harm to others due to his mental disorder.

Defendant disputes the trial court's conclusions. Although he conceded that substantial evidence supports the finding that his mental disorder cannot be kept in remission without treatment, he initially argues that pedophilic disorder may go into remission, the expert witnesses' opinions notwithstanding, and his illness was in remission—a fact the trial court should have taken into consideration but did not. Because there is no evidence that defendant raised this argument at the trial court, the evidence he relies on here to make the argument is not in the record, and he has conceded there is sufficient evidence to support the trial court's determination that his mental disorder cannot be kept in remission without treatment, this argument is forfeited. (*Sander v. Superior Court* (2018) 26 Cal.App.5th 651, 670.) In any event, by statute, a person cannot be kept in remission if during the prior year he "has not voluntarily followed the treatment plan." (§ 2962, subd. (a)(3).) Because defendant has not followed his treatment plan, for purposes of the petition to recommit him, he is not in remission.

Defendant argues the evidence shows he is a low risk of reoffending as established by his score on the Static-99R performed by Dr. Wagner and of which the trial court apparently took judicial notice. He asserts it is difficult to understand how a recidivism rate of 2.5 to 3 percent could be characterized as representing a substantial danger of physical harm to others.

21

Defendant states his unwillingness to participate in sex offender training appears to be the only substantial way in which he failed to comply with his treatment plan and the reason the trial court did not rely on his Static-99R score. But he argues an unwillingness to comply with sex offender treatment groups does not indicate that someone represents a substantial danger of physical harm to others. Defendant had already completed a sex offender treatment program at Atascadero, and he had completed 10 years of treatment at Napa. To the extent there was a dispute over whether defendant completed the program at Atascadero, he contends the burden was on the government to produce hospital records showing he had not completed the program.

Defendant states the trial court further justified its ruling by citing his purported lack of emotional regulation and insight into his pedophilia. But he claims no evidence supported those assertions, and in any event, all of that "was baked into the Static-99R." Moreover, the trial court looked at defendant's misbehaviors and conflated them with his risk of reoffending when in fact they had nothing to do with his pedophilia. Defendant argues he has been involuntarily confined with no evidence that he had engaged in any type of misconduct that could be attributed to his severe mental disorder for an unknown number of years. He contends that under these circumstances, the trial court's determination that he is a substantial danger of physical harm to others is not supported by any evidence.

Defendant's argument does not take Dr. Gates's expert testimony fully into account. In her opinion, defendant's unwillingness to attend sex offender treatment and the other courses required by his treatment plan indicates he is a substantial danger of physical harm to others because his pedophilic disorder is a chronic condition that requires on-going treatment, support systems, and reminders to keep the condition stable. A complete sex offender treatment program is necessary for defendant to learn coping mechanisms and how to deal with his urges once he is in the community. Due to the disorder's chronic nature, a complete course was warranted even though defendant had

22

previously completed part of a sex offender treatment course at Atascadero more than 20 years ago.  Given his tendency to isolate and limit interaction with others, this, too, supported the trial court's decision that defendant was likely to reoffend in the community were he to continue not to comply with his treatment plan.

Defendant cites to appellate opinions where the Court of Appeal determined insufficient evidence supported a trial court's ruling that the defendant continued to qualify as an OMHD.  (See *People v. Johnson* (2020) 55 Cal.App.5th 96; *People v. Jenkins*, *supra*, 95 Cal.App.5th at p. 142.)  We distinguished those cases and disagreed with defendant's reliance on his Static-99R score in the unpublished portion of our opinion affirming defendant's recommitment in 2023, and that reasoning applies equally here.  After determining the evidence of defendant's danger to others was substantial, we stated:

"This is more than the evidence found insufficient in *Johnson*, *supra*, 55 Cal.App.5th 96 and *People v. Jenkins*, [*supra*,] 95 Cal.App.5th [at page] 142, on which defendant relies.  In *Johnson*, the appellate court reversed a commitment extension order where the record was devoid of evidence suggesting the 69-year-old defendant's failure to take medication in an unsupervised setting would lead to violence, particularly in light of the fact that he had spent 11 years in the community and had stopped taking his medication for substantial periods of time with no violent repercussions.  (*Johnson*, at pp. 99, 107, 108-109.)  Moreover, the defendant in *Johnson* was in partial remission, was able to take care of himself, and had not committed a violent act in 30 years.  (*Id.* at pp. 101, 104, 111.)  The *Johnson* court found, 'Such a complete absence of violent or aggressive behavior of any kind over a long period of time is necessarily an important, objective factor that must not be ignored when determining an [OMHD] defendant's dangerousness.'  (*Id.* at p. 110.)

"In *People v. Jenkins*, *supra*, 95 Cal.App.5th at pages 146 and 151, the appellate court concluded the defendant did not represent a substantial danger of physical harm to

others because 'there [was] no evidence [the defendant had] been violent or physically aggressive since her commitment offense in 1999,' more than two decades before the recommitment proceedings. At the time of the hearing, the defendant was almost 70 years old, in poor health, and had started to use a wheelchair due to decreased mobility. (*Id.* at p. 153.)

"Here, in contrast, the evidence demonstrated defendant engaged in a violent or aggressive act within a year of his recommitment hearing [the October 2022 incident] and had not successfully lived outside the structured setting of a state hospital, and nothing indicated he was in poor physical health. Further, defendant's mental health disorder of pedophilia is not treatable by medication, and instead patients with pedophilia must rely on skills learned in sex offender treatment programs, in which there was no record of defendant's participation. Unlike *Johnson* and *Jenkins*, defendant does not pose a risk of harm based on his potential to commit uncontrollable violent outbursts. Defendant's risk is based on his ability to identify triggers that lead to offending and ways to prevent offending, regardless of demographic factors. Because defendant has not participated in treatment programs, substantial evidence supports the trial court's implied finding defendant does not possess the skills necessary to reduce his risk of harm and continues to pose a substantial risk.

"Defendant disagrees with this conclusion, arguing his estimated 2.5 to 3 percent risk of reoffending, based on his Static-99 score, overcomes the evidence against him. 'The Static-99 test is an actuarial instrument that allows an evaluator to place sexual offenders in different risk categories based on historical (static) factors such as age, marital status, the number of prior offenses, the relationship of the offender to the victims and the gender of the victims. After identifying the particular characteristics of the offender, the Static-99 test assigns a numeric score to them. The total score of the test is a percentage chance of the defendant's likelihood of being convicted for a future sexual offense.' (*People v. Therrian* (2003) 113 Cal.App.4th 609, 612.) The Static-99 test is not

24

infallible, and a fact finder is not required to exclusively rely on it to determine an offender's chances of reoffending. (*Id.* at p. 616 [holding that so long as an expert adequately explains other factors considered, 'no reasonable juror would mistake [an] expert's use of the Static-99 test as a source of infallible truth on the issue of defendant's risk of reoffending'].)

"Dr. Wagner and the trial court considered defendant's Static-99 score. They, however, also relied on other individualized factors personal to defendant, including defendant's failure to attend treatment and develop the necessary skills to prevent reoffending, and his failure to control his impulses. Thus, while defendant's Static-99 score was low, it was but one factor the court considered in granting the recommitment petition, not a dispositive one. (See *People v. Stoll* (1989) 49 Cal.3d 1136, 1159 ['no reasonable juror would mistake an expert's reliance on standardized tests as a source of infallible "truth" on issues of personality, predisposition, or criminal guilt'].) Considering the whole of the record, as we must (*Johnson*, *supra*, 55 Cal.App.5th at p. 107), sufficient evidence supports the trial court's finding that defendant posed a substantial danger to the public." (*People v. Zwerenz* (2024) 107 Cal.App.5th 719, 727, [nonpub. portion of opn.].)

The evidence before us today is nearly identical to that introduced in 2023, except that defendant has gone another year without participating in sex offender treatment. It continues to qualify as substantial evidence in support of the trial court's ruling beyond a reasonable doubt that defendant posed a substantial danger of physical harm to others.

II

*Outpatient Release*

Where commitment under the Mentally Disordered Offenders Act has been continued, the committing court has authority to release a patient for outpatient treatment if the court finds "there is reasonable cause to believe that the committed person can be

safely and effectively treated on an outpatient basis." (§ 2972, subd. (d); *People v. May* (2007) 155 Cal.App.4th 350, 359.) The patient bears the burden of proof to show reasonable cause. (*People v. Gregerson* (2011) 202 Cal.App.4th 306, 315-316.) To establish reasonable cause to obtain outpatient treatment, the patient "must raise a strong suspicion in a person of ordinary prudence that outpatient treatment would be safe and effective." (*Id*. at p. 319.)

Defendant contends the trial court misapplied the standard for determining reasonable cause when it denied his request to be released on outpatient status. The standard for determining reasonable cause is akin to the "probable cause" standard applied under the Sexual Violent Predators Act (Welf. & Inst. Code, § 6600 et seq. (SVPA)) when a trial court determines whether an SVPA petition states sufficient facts to constitute probable cause to believe the defendant is likely to engage in sexually violent predatory criminal behavior upon release from prison and to hold the defendant over for trial on the petition's merits. (*People v. Gregerson*, *supra*, 202 Cal.App.4th at pp. 318-319.) A determination of probable cause by the trial court under the SVPA " 'entails a decision whether a reasonable person could entertain a strong suspicion that the offender is [a sexually violent predator].' " (*Id*. at p. 319, quoting *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 252, italics omitted.)

The SVPA standard of probable cause, and thus the Mentally Disordered Offenders Act's standard of reasonable cause, are derived from the felony preliminary hearing context. (*Cooley v. Superior Court*, *supra*, 29 Cal.4th at p. 251.) In that context, " ' " '[p]robable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused.' " [Citations.]' [Citations.] In making the determination of probable cause, the magistrates do not themselves decide whether the defendant is guilty. [Citations.] Rather, they simply decide whether a reasonable person could harbor a strong suspicion of the

26

defendant's guilt. In doing so, they may 'weigh the evidence, resolve conflicts, and give or withhold credence to particular witnesses.' " (*Ibid*.)

Thus, to obtain outpatient release under the Mentally Disordered Offenders Act, "the patient must raise a strong suspicion in a person of ordinary prudence that outpatient treatment would be safe and effective." (*People v. Gregerson*, *supra*, 202 Cal.App.4th at p. 319.) The patient need not meet the higher burden imposed by the preponderance of evidence standard usually required in civil matters. (*Ibid*.) But the patient must establish with sufficient evidence how he "intended to comply with outpatient treatment and how such treatment would be safe and effective." (*People v. Rish* (2008) 163 Cal.App.4th 1370, 1385.)

A trial court asked to determine whether reasonable cause exists that the patient can be safely and effectively treated on an outpatient basis, similar to a trial court in a criminal probable cause hearing, " ' "may weigh the evidence, resolve conflicts, and give or withhold credence to particular witnesses." ' " (*Cooley v. Superior Court*, *supra*, 29 Cal.4th at p. 257.) "In performing its role at the probable cause hearing, therefore, the superior court may evaluate the validity of any evidence presented by an expert, as well as judge the credibility of any expert witness who testifies at the hearing. Any credibility determination to be made at the probable cause stage, however, whether in a civil or criminal proceeding, is a gross and unrefined one. The superior court should not find an absence of probable cause simply because it finds the defense witnesses slightly more persuasive than the prosecution witnesses. Rather, to reject the prosecution evidence at the probable cause stage, either the evidence presented must be inherently implausible, the witnesses must be conclusively impeached, or the demeanor of the witnesses must be so poor that no reasonable person would find them credible. Thus, if the prosecution presents evidence a reasonable person could accept over that presented by the defense, probable cause should be found. The superior court may not substitute its own personal

27

belief as to the ultimate determination to be made at trial for that of a reasonable person evaluating the evidence." (*Id.* at pp. 257-258.)

We review a trial court's ruling on a request for outpatient treatment for substantial evidence. "[I]f the court grants outpatient treatment, its order will be affirmed if substantial evidence shows reasonable cause existed to believe outpatient treatment would be safe and effective. If the court denies outpatient treatment, its order will be affirmed if substantial evidence shows there was no such reasonable cause. In any event, if substantial evidence does not support the court's order, it must be reversed." (*People v. Gregerson*, *supra*, 202 Cal.App.4th at p. 320.)

The trial court determined there was not reasonable cause to believe defendant could be safely and effectively treated on an outpatient basis. Relying on Dr. Gates's testimony and defendant's medical records, the court found this was because defendant was unlikely to access treatment services on an outpatient basis. In the court's view, this finding was "not controverted by any meaningful way." The court recognized that Bolin "took a different position than Dr. Gates," but it found, "in review of the basis, and in consideration of the testimony offered, that Dr. Gates'[s] testimony is more compelling, and more consistent, with the facts of the case. And therefore, the Court relies on this testimony in making the determinations as noted above."

Defendant contends the trial court applied the wrong standard for determining reasonable cause. He claims the court could not ignore Bolin's testimony—that defendant would be suitable for release from custody—without finding her testimony was inherently implausible or conclusively impeached, or that her demeanor was so poor that no reasonable person would find her credible. The court made no such finding.

Nor was defendant's low score on the Static-99R conclusively impeached. Defendant claims a reasonable person could have relied on his Static-99R score by itself to find reasonable cause to strongly suspect that he could be safely and effectively treated in the community.

28

Defendant argues the court overstepped its limited authority to make credibility determinations and reject expert opinion at the reasonable cause stage. (See *People v. Consiglio* (2022) 86 Cal.App.5th 615, 622 [trial court improperly made credibility determination of expert opinion instead of applying reasonable person standard for determining probable cause].) This resulted in the court determining that defendant was not suitable for conditional release instead of determining whether a reasonable person could have held a strong belief that defendant was suitable for conditional release.

Defendant claims that on this record, a reasonable person would have entertained a strong suspicion that defendant could be safely and effectively treated in the community under CONREP's supervision. His failure to attend sex offender treatment at Coalinga notwithstanding, he had successfully completed the sex offender treatment program at Atascadero and received 10 years of treatment at Napa. Because he had graduated from a treatment program in the past, he asserts there was no reason to believe he would not complete the treatment programs he would be required to undergo while in CONREP, including a sex offender treatment that assertedly would be new and different from what he had already completed.

Substantial evidence supports the trial court's ruling that defendant did not establish reasonable cause, i.e., a strong suspicion in a reasonable person that outpatient treatment would be safe and effective. Defendant did not establish with sufficient evidence how he "intended to comply with outpatient treatment and how such treatment would be safe and effective." (*People v. Rish*, *supra*, 163 Cal.App.4th at p. 1385.) He directs us to no testimony or report indicating he would participate in or comply with the requirements of outpatient treatment or that such treatment would be effective.

What evidence existed established that defendant would likely not participate in outpatient treatment. A patient approved by the court for outpatient status is subject to the treatment plans and directives the patient receives in outpatient treatment. (§ 2972, subd. (d).) Since defendant has been committed at Coalinga in 2013, he has repeatedly

refused to engage in treatment directed by his treatment plan. Specifically, he has refused to participate in group sex offender treatment and the WRAP group despite his participation in those trainings being required by his treatment plan for discharge. His long-standing refusal to participate in inpatient treatment supported the court's conclusion that defendant did not establish a strong suspicion, based on that of a reasonable person evaluating the evidence, that he would participate in outpatient treatment and the treatment thus would be effective.

While defendant contends the trial court should have relied on Bolin's opinion that he was safe to be discharged, Bolin's testimony was not as supportive as he argues. Bolin was contradictory and did not address outpatient treatment. She stated that defendant had failed to meet his discharge requirement of completing sex offender treatment, but yet she opined he was ready to be discharged. Like Dr. Gates, Bolin understood that defendant was required to participate in sex offender treatment at Coalinga despite any other training he had received, and that he had failed to do so. Moreover, her testimony did not establish that defendant, if he could be discharged, would comply with outpatient treatment.

Bolin understood the significance of defendant completing the sex offender treatment provided at Coalinga and his decision not to receive the treatment. Asked by the court to elaborate on what she meant by saying defendant partially completed sex offender training at Atascadero, Bolin stated she believed defendant had partially competed the training "[b]ecause we don't have any certificate of completion to show he completed the sexual offender program. We have one court document referring to his having had that treatment. But when it -- when he came to Coalinga -- we have a treatment plan that's our very own, and it often doesn't always include what they've done at a former hospital. Unfortunately, patients don't always get credits for things they've done at other hospitals. And so, we want him to complete the treatment plan that we've developed here. And that's why he was required to go to the sex offender treatment."

30

Asked by the court whether it was her understanding that there was partial completion at Atascadero or at Coalinga, Bolin stated, "Well, we didn't verify that he completed the SOT. It's not verified. I saw and read the court document referring to the fact that he had that program. So, he has to adhere to our treatment plan. And we asked him to go to that -- to our treatment here -- and he didn't do that. So that's why it's partially completed.

"THE COURT: Okay. So partially completed here at Coalinga.

"THE WITNESS: Yes. Partially completed."

On further cross-examination, the prosecutor asked Bolin whether defendant had ever participated in a group sex offender treatment program while at Coalinga. Bolin responded, "Not that I know of. I know on our unit, he has not."

Bolin understood that defendant had refused to complete sex offender training at Coalinga, a prerequisite for his ultimate discharge, but yet she opined he was safe and should be discharged. And she offered no opinion on whether defendant, if he were discharged, would participate in outpatient treatment. On the other hand, Dr. Gates, in her August 3, 2023 report, repeated that defendant was not suitable for outpatient treatment. Because the undisputed evidence showed that defendant had refused to participate in required inpatient treatment for years, the trial court concluded there was no reasonable cause to believe defendant would participate in outpatient treatment and be effectively treated. No substantial evidence suggests otherwise.

Defendant argues that had the trial court understood the restrictive nature of CONREP and the conditions imposed on a patient's participation in that treatment, the court would have found defendant suitable for the treatment. Because defendant did not make this argument at trial, it is forfeited. (*Sander v. Superior Court*, *supra*, 26 Cal.App.5th at p. 670.)

31

## III

### *Ineffective Assistance*

Defendant asserts his trial counsel rendered ineffective assistance by not asking the trial court to take judicial notice of his Static-99R score and information regarding its significance, by not retaining an expert witness to explain the score's significance, by not otherwise demonstrating defendant was not an OMHD and was ready for conditional release, and for failing to understand the relevant law concerning review of requests for outpatient treatment and fully explain and argue it to the court.

To establish a claim of ineffective assistance of counsel, defendant must first show counsel's performance was deficient because it " 'fell below an objective standard of reasonableness under prevailing professional norms.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.) Second, the defendant must show " 'resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*Ibid*.) Whether counsel's performance was deficient, and whether any deficiency prejudiced defendant, are mixed questions of law and fact we review independently. (*In re Gay* (2020) 8 Cal.5th 1059, 1073.)

As to the reasonableness of counsel's performance, we presume the performance " ' "fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 125.) Defendant's burden to overcome this presumption is difficult to carry on direct appeal because the record often does not disclose the reason for counsel's action. (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.) For that reason, "we may reverse 'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*Ibid*.) " 'All

32

other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.' " (*People v. Hoyt*, *supra*, 8 Cal.5th at p. 958.)

As for the prejudice requirement, we may reject a claim of ineffective assistance for lack of prejudice without addressing whether counsel's performance was deficient. (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

We conclude defense counsel's performance did not result in prejudice. The trial court appeared to take judicial notice of defendant's Static-99R score, considered it, and understood the test's purpose. Nonetheless, the court ruled that the score was not determinative, and other evidence indicated defendant posed a substantial danger of physical harm to others if he were released. Even if defense counsel had retained an expert to explain the Static-99R in more detail, it is not reasonably probable defendant would have obtained a more favorable verdict.

Defendant also suffered no prejudice due to defense counsel's performance on defendant's request for outpatient treatment. As explained above, the trial court understood the relevant standards of proof. And even if counsel had presented evidence establishing that defendant would have been required to attend sex offender treatment as a condition of receiving outpatient treatment, that evidence would not have established a strong suspicion in a reasonable person that defendant would have participated. Defendant's reason for not participating in sex offender treatment, even though it was required for his discharge, was he had already received sex offender treatment. That logic would still apply if he were required to participate in outpatient sex offender treatment. It thus was not reasonably likely that defendant would have obtained a more favorable outcome had counsel more thoroughly explained outpatient treatment to the court.

33

DISPOSITION

The judgment is affirmed.

 

 

 

| | |
|---|---|
| | _____ |
| | HULL, Acting P. J. |

We concur:

 

 

_____
ROBIE, J.

 

 

_____
KRAUSE, J.